UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
_____
                                )
BRIAN GAILEY,                   )
                                )
          Plaintiff,            )
                                )
     v.                         )      C.A. No. 21-201 WES
                                )
ELECTRIC BOAT CORPORATION,      )
                                )
          Defendant.            )
_____ )
```

## MEMORANDUM AND ORDER

WILLIAM E. SMITH, District Judge.

In this failure to accommodate and wrongful termination case, Plaintiff Brian Gailey alleges that his former employer, Defendant Electric Boat Corporation ("Electric Boat") discriminated against him based on his disability in violation of federal and state law. See Compl., ECF No. 1-1. Currently before the Court is Electric Boat's Motion for Summary Judgment, ECF No. 21. For the reasons below, the Court GRANTS the Motion.

I. BACKGROUND[1]

Electric Boat designs and builds nuclear submarines for the U.S. Navy. Pl.'s Resp. Def.'s Statement Undisputed Facts ("PRSUF")

_____

[1]Throughout Plaintiff's response to Electric Boat's Statement of Undisputed Facts, he makes legal arguments and fails to support contentions that certain facts are disputed. As appropriate, the Court treats such facts as undisputed.

¶ 1, ECF No. 27-1.  Plaintiff began working for Electric Boat in 1974 at the Groton, Connecticut location and transferred to the North Kingstown, Rhode Island location in 1978.  Id. ¶¶ 3-4.  In 1986, Plaintiff transitioned from working as a pipefitter to working as an inspector.  Id. ¶¶ 4-5.

"Plaintiff was responsible for inspecting components, parts and assemblies of the submarines during the building phase."  PRSUF ¶ 9.  Plaintiff would inspect welds on submarine pressure hulls, fittings, and other key components, using visual inspection as well as "certain specialized types of inspection, including magnetic particle inspections, radiography (X-ray), and . . . liquid chemical penetrants."  Id.  ¶¶ 11, 13-14.  He was also responsible for determining whether any of the components he inspected had any defects.  Id. ¶ 12.  At least some inspections Plaintiff conducted involved "critical inspections."  See id. ¶ 21.  The inspector position is "safety-sensitive" and requires constant awareness.  Id. ¶¶ 17-18.

In the 1980s, Plaintiff began to suffer from infrequent seizures, sometimes impacting his memory, but the seizures did not begin to affect his work until 2011.  See id. ¶¶ 6, 26.  On an unspecified day in October 2011, Plaintiff informed his supervisor that he was going to move his truck; instead, he drove himself home.  Id. ¶ 26.  When he arrived home, Plaintiff called his

supervisor and explained that he had unintentionally driven himself home.  Id. ¶ 27.  He could not explain why he had done so. Id.  As a result, Plaintiff was placed out of work until his medical provider and neurologist cleared him to return on November 15, 2011.  Id. ¶ 28.

In the following years, Plaintiff experienced several more incidents at work.  In September 2014, after completing an inspection, Plaintiff fell off a ladder while descending.  Id. ¶ 29.  As a result, Electric Boat placed Plaintiff out of work for several days, and when he returned it imposed a no ladders restriction on Plaintiff's work.  Id. ¶ 30.  In August 2015, several witnesses reported that Plaintiff was presenting with a blank stare and was not responding to questions.  See id. ¶ 31. Security personnel brought Plaintiff to Electric Boat's medical dispensary[2] where he reported a gap in his memory.  Id. ¶¶ 31-32. Electric Boat then placed Plaintiff out of work for several days until the dispensary cleared him to return to work.  Id. ¶ 33.  He

_____

[2]"Electric Boat maintains an in-house medical dispensary with medical staff whose role is to ensure that employees are physically able to perform their jobs."  Pl.'s Resp. Def.'s Statement Undisputed Facts ("PRSUF") ¶ 23, ECF No. 27-1.  The Court notes here that Plaintiff avers that he was not aware that this was the purpose of the dispensary.  Id.  Whether Plaintiff was aware of this purpose does not render the fact disputed, and Plaintiff has not established how his knowledge or lack thereof is relevant here.

was also instructed to follow up with his neurologist.  Id.

On April 20, 2016, Plaintiff's supervisor referred him to the dispensary because Plaintiff was "staring and out of focus[.]" Id. ¶ 34.  Plaintiff again explained that he was forgetful.  Id. ¶ 35.  Although Plaintiff was allowed to return to work, Dr. Susan Andrews, Electric Boat's Medical Director, explained that she would contact Plaintiff's neurologist to discuss the need for any additional work restrictions.  Id. ¶¶ 24, 36.  In June 2017, Plaintiff was again placed out of work, pending a memory specialist medical evaluation, due to memory concerns.  Id. ¶ 39.  He returned to work in November 2017.  Id.

On or around January 22, 2018, while attending a required class, Plaintiff stood up and walked out[3] (hereinafter the "January 22nd incident").  Id. ¶ 40.  Security Personnel followed Plaintiff and asked him a series of basic questions to assess his cognizance, and Plaintiff could not state the President's name or the day of the week.[4]  Id. ¶ 41.  Security then escorted Plaintiff to the dispensary.  Id. ¶ 40.  "In light of the January 22 Incident, as

---

[3]Although Plaintiff did not believe a seizure caused his behavior, his treating neurologist disagreed.  PRSUF ¶ 54.

[4]Plaintiff avers that although he "did not answer those questions, it was not because he couldn't, but because rather, he did not believe anyone had the right to ask [him] those demeaning questions."  PRSUF ¶ 41.

4

well has [Plaintiff's] candid admissions[5] to the nurse in the medical dispensary, Electric Boat again placed Plaintiff out of work with instructions that he follow up with his medical providers." Id. ¶¶ 42-43 (footnote added).

In early February, Plaintiff called Electric Boat and reported that his treating neurologist, Dr. Randy Kozel, had cleared him to return to work. Id. ¶ 44. However, Dr. Andrews placed a "no critical inspections" restriction on Plaintiff's return to work. Id. ¶ 45; see also id. ¶ 22. As a result of this restriction, Electric Boat convened its Accommodation Review Committee ("ARC") to "better understand Plaintiff's medical circumstances, his ability to perform the essential functions of the job, and possible accommodations" and to ultimately determine what work was available to Plaintiff given the imposed restrictions. Id. ¶ 46. The ARC consists of representatives from the medical, legal, and human resources departments as well as a representative from the impacted employee's department. Id. Plaintiff emphasizes that Electric Boat did not explain the ARC process to him. Id.

Next, Dr. Andrews called Plaintiff, and Plaintiff insisted that he did not need any accommodations to perform his job. Id.

---

[5]The nature of these admissions is disputed. See PRSUF ¶ 42.

¶ 49.   Dr. Andrews then reached out to Dr. Kozel, providing him with a description of Plaintiff's job (described as "the essential functions" of the position) and asking for input regarding Plaintiff's limitations and possible accommodations.   Id. ¶¶ 50-51.   Although Plaintiff had informed Dr. Kozel to not respond to any of Electric Boat's requests for information, Dr. Kozel explained to Dr. Andrews that "Plaintiff has breakthrough partial complex seizures that put him at risk of harm to himself or others" and recommended that Plaintiff not return to work.[6]  Id. ¶¶ 55-56.

Some time later, in May 2018, Plaintiff provided a letter from his new treating neurologist, Dr. William Stone.   Id. ¶ 58. In the letter, Dr. Stone provided:

> The extensive neuropsychological testing performed by Dr. Lee [in August of 2017] indicates that [Plaintiff's] cognitive capacity is compatible with him returning to work as an inspector.  I agree with this assessment with the caveat that he needs to be well rested (i.e.[,] not sleep deprived), take his seizure medicine on schedule without fail and maintain a high therapeutic range (80-100 ug/mL) valproic acid serum concentration.  This is because he retains adequate memory and cognitive capacity so long as he is not having a complex partial, localization-related seizure or in a post ictal period of confusion (both of which probably contributed to the events which occurred at work on the evening of January

---

[6]Although Plaintiff disputes this statement of fact, he does so on the basis that he was never informed about this conversation. PRSUF ¶ 56.  Accordingly, the Court treats this statement of fact as undisputed.  See also n.1 supra.

22, 2018).

Stone Letter 4, DXD, ECF No. 22-1.  Dr. Andrews followed up to get more information, sending a letter describing Plaintiff's essential job functions and providing an evaluation checklist. PRSUF ¶¶ 60-61.  On the checklist, Dr. Stone reported that Plaintiff was able to perform his duties "as long as he isn't seizing" and that he would not pose any significant risk of harm to himself or others "as long as his seizures are controlled." Id. ¶ 62.  Aside from his earlier statement about rest and medication and a statement that Plaintiff should not work overtime and should have "adequate time" to complete work, Dr. Stone did not indicate how to identify when Plaintiff was seizing or whether his seizures were controlled.  See id. ¶ 63; Evaluation Checklist 1-2, DXF 2, ECF No. 22-1.  After these communications, Dr. Andrews did not remove the "no critical inspections" restriction placed on Plaintiff's work.  PRSUF ¶ 64.  Following the ARC process, in addition to the no critical inspections restriction, Electric Boat placed no "ladders, stairs, staging, production areas, driving, tanks, confined space" restrictions on Plaintiff's work.[7]  ARC Interview Two 1, DXG, ECF No. 22-1.

On July 23, 2018, Dr. Andrews called Plaintiff to discuss her

---

[7]These restrictions are not material to the parties' arguments.

medical review, but Plaintiff refused to speak with her and told her to speak to his attorney instead. PRSUF ¶ 65. In a later call, with Plaintiff's attorney on the line, Plaintiff admitted that he has issues where he becomes forgetful. Id. ¶ 67. Plaintiff also insisted that he did not need or want any accommodations and could continue to perform his work without any changes. Id. ¶ 68.

In light of the new medical information Dr. Stone provided, the ARC had been reconvened, and, on August 23, 2018, it determined that it could accommodate all of the restrictions except for the "no production areas" and "no critical inspections" restrictions. Id. ¶¶ 66, 69. The ARC consulted a representative from Plaintiff's department, who explained that "an essential function of the Inspector role . . . is critical inspections," "critical inspection is required in all aspects of the Inspector's role and that Inspectors work in several production areas throughout the facility," and "critical inspection is the most important aspect of the role." Id. ¶ 70. Accordingly, the ARC determined that Plaintiff could not perform the essential functions of the job[8] and that no accommodations would change that and no alternative work was available for Plaintiff. Id. ¶¶ 70-71. Thus, Electric

---

[8]This is not a legal conclusion but a determination Electric Boat made; whether Plaintiff could perform the essential functions of the job as a matter of law is discussed infra.

Boat terminated Plaintiff's employment effective September 13, 2018. Id. ¶ 72.

Plaintiff initiated this lawsuit in Rhode Island Superior Court alleging discrimination in violation of The Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq.; Rhode Island State Fair Employment Practices Act ("RIFEPA"), R.I. Gen. Laws § 28-5-1, et seq.; Rhode Island Civil Rights of People with Disabilities Act ("RIPDA"), R.I. Gen. Laws § 42-87-1, et seq.; and the Rhode Island Civil Rights Act of 1990 ("RICRA"), R.I. Gen. Laws § 42-112-1, et seq. Compl. ¶¶ 37-47. Electric Boat removed the case to this Court. Notice Removal, ECF No. 1. Together with alleging standard discrimination, Plaintiff argues that Electric Boat failed to provide him with reasonable accommodations as required by the ADA. Pl.'s Mem. Supp. Summ. J. Opp'n ("Pl.'s Mem.") 13, ECF No. 27.

Electric Boat has now moved for summary judgment arguing that Plaintiff cannot make out a prima facie case of discrimination as his condition prevented him from performing the essential functions of his position, with or without a reasonable accommodation.[9] Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem.")

---

[9] Electric Boat also argues that it had a legitimate, nondiscriminatory reason for terminating Plaintiff's employment and that Plaintiff cannot show that such reason was pretextual. Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem.") 9, 13, ECF No. 21-

9, 13, ECF No. 21-1.  The Court agrees.[10]

II. LEGAL STANDARD

To succeed at summary judgment, the moving party must show there is no genuine issue of material fact and that judgment is appropriate as a matter of law.  Fed. R. Civ. P. 56.  A factual dispute is genuine if it "may reasonably be resolved in favor of either party," and the fact finder must "make a choice between the parties' differing version of the truth at trial."  Vineberg v. Bissonnette, 529 F. Supp. 2d 300, 301 (D.R.I. 2007) (internal citations omitted).  A fact is material if its determination one way or the other "has the capacity to sway the outcome of the litigation under the applicable law."  Id. at 301-02 (internal citations omitted).  When reviewing a motion for summary judgment, the Court must "view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor."  Id. at 302 (quoting Fed. R. Civ. P. 56(e)).  If the nonmoving party "fail[s] to come forward with sufficient evidence to generate a trialworthy issue[, that

---

1.  Because the Court agrees with Electric Boat's first argument, it need not consider this one.

[10]In making its decision, the Court relies on the original briefing on the matter, ECF Nos. 21-1 and 27, as well as the supplemental briefing, ECF Nos. 48 and 49.

failure] warrants summary judgment to the moving party." Id. (internal citations omitted).

III. DISCUSSION

Plaintiff's disability discrimination claims are analyzed under the burden-shifting framework laid out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800-06 (1973). See Flaherty v. Entergy Nuclear Operations, Inc., 946 F.3d 41, 53 (1st Cir. 2019)(applying the McDonnell Douglas test to ADA claims); Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 160 (1st Cir. 1998) ("[W]hen there is no direct evidence of discrimination, the McDonnell Douglas burden-shifting framework applies to claims that an employee was discriminated against for availing himself of FMLA-protected rights."); Pena v. Honeywell Int'l, Inc., 923 F.3d 18, n.6 (1st Cir. 2019) (internal citations omitted) ("Rhode Island courts look to federal case law construing the [ADA] in evaluating analogous state law discrimination claims."); Deighan v. SuperMedia LLC, C.A. 14-264 S, 2016 WL 6988813, at *8 (D.R.I. Nov. 29, 2016)(applying the McDonnell Douglas test to RIPDA, RIFEPA, and RICRA claims).

Under this approach, to survive a motion for summary judgment, Plaintiff must present enough evidence for a reasonable jury to find that (1) he suffers from a disability, (2) he was nevertheless able to perform the essential functions of his job, either with or

without a reasonable accommodation; and (3) Electric Boat took an adverse employment action against him because of his disability. See Pena, 923 F.3d at 27 (citing Tobin v. Liberty Mut. Ins. Co., 433 F.3d 100, 104 (1st Cir. 2005); 42 U.S.C. § 12111(8)); see also Freadman v. Metro. Prop. and Cas. Ins. Co., 484 F.3d 91, 102 (1st Cir. 2007). For a failure to accommodate claim, rather than establishing an adverse employment action, Plaintiff must establish that, although Electric Boat knew of Plaintiff's disability, it "did not reasonably accommodate it." Pena, 923 F.3d at 31 (quoting Tobin, 433 F.3d at 107; citing 42 U.S.C. § 12111(8)).

This summary judgment motion zeros in on element two: whether Plaintiff could perform the essential functions of the position with or without a reasonable accommodation. See Def.'s Mem. 9-10. The Court concludes that Electric Boat has established that critical inspections are an essential function of the inspector position and that Plaintiff cannot conduct critical inspections, with or without an accommodation. Electric Boat is thus entitled to summary judgment.

A. Critical Inspections are an Essential Function of the Inspector Position

The Court begins with determining whether critical inspections are an essential function of the inspector position.

12

If they are, Electric Boat prevails and the Court moves on to the second half of the inquiry; but if critical inspections are not an essential function of the job, Plaintiff prevails and summary judgment is not warranted.

Although the second element—the same for both claims—is Plaintiff's burden to prove, see Gillen v. Fallow Ambulance Serv., Inc., 283 F.3d 11, 24 (1st Cir. 2002), it is the employer's burden to establish the essential functions of the position at issue, see Ward v. Mass. Health Rsch. Inst., Inc., 209 F.3d 29, 35 (1st Cir. 2000) ("And the defendant, who has better access to the relevant evidence, should bear the burden of proving that a given job function is an essential function."), see also Laurin v. Providence Hosp., 150 F.3d 52, 61 (1st Cir. 1998).

"An essential function is one that is 'fundamental' to a position.  The term does not include 'marginal' tasks[] but may encompass individual or idiosyncratic characteristics of the job." Sepulveda-Vargas v. Caribbean Rests., LLC, 888 F.3d 549, 553 (1st Cir. 2018) (internal citations and quotation marks omitted). "[T]he complex question of what constitutes an essential job function involves fact-sensitive considerations and must be determined on a case-by-case basis."  Id. (quoting Gillen, 283 F.3d at 25).  EEOC regulations provide some guidance:

Evidence of whether a particular function is essential

includes, but is not limited to:

> (i)     The employer's judgment as to which functions are essential;
>
> (ii)    The written job descriptions prepared before advertising or interviewing applicants for the job;
>
> (iii)   The amount of time spent on the job performing the function;
>
> (iv)    The consequences of not requiring the incumbent to perform the function;
>
> (v)     The collective bargaining agreement;
>
> (vi)    The work experience of past incumbents in the job; and/or
>
> (vii)   The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3).

Here, while Electric Boat could have provided more robust support for its position, it has done enough to shift the burden to Plaintiff. See Laurin, 150 F.3d at 61. Most significantly, Electric Boat has demonstrated its good-faith view that critical inspections are an essential function of the position. See Gillen, 283 F.3d at 25. Although an employer's conclusion is not dispositive, it is a factor in the mix and should be given "substantial weight." See Ward, 209 F.3d at 34; see also Gillen, 283 F.3d at 25. An employer must do more than just say it is so. Its position must be taken in good faith and be buttressed. Here there is the following: Dr. Andrews' averment that the ability to perform critical inspections is an essential function of the position, Andrews Decl. ¶ 38, ECF No. 22-1; Electric Boat's

14

overview of the position,[11] Inspector Skilled Job Overview 1, DXA, ECF No. 22-1; Dr. Andrews' letter to Plaintiff's neurologist explaining the inspector position and requesting information on Plaintiff's ability to perform the listed tasks,[12] Gailey Employee File 55, DXB, ECF No. 21-1; a department representative's explanation that "critical inspection is required in all aspects

---

[11]The job description for this role provides:

Inspectors will be required to perform inspection duties in the various inspection areas throughout the facility. Candidates will be required to be train in the Quality Control systems, procedures and will inspect incoming piece parts, components and perform various types of inspections on the hull sections. Types of inspections will or may include visual, dimensional, and nondestructive test attributes. Inspectors will also be required to verify and certify work is complete and satisfactory according to specifications and record and report inspection results. The successful candidate must be able to work all shifts, weekends and overtime is required.

Inspector Skilled Job Overview 1, DXA, ECF No. 22-1.

[12]The letter to Dr. Kozel provided:

Mr. Gailey is currently classified as an inspector, which requires him to be able to look for, identify, and monitor construction joints. In this capacity he is required to make independent judgment as to whether or not to pass or reject the joints, the rejections may be as small as the tip of a pen. My initial assessment is that he is unable to perform these essential functions of the job, with or without accommodations.

Gailey Employee File 55, DXB, ECF No. 21-1.

of the Inspector's role and that Inspectors work in several production areas throughout the facility," and "critical inspection is the most important aspect of the role," PRSUF ¶ 70; and the letter terminating Plaintiff's employment due to his "inability to perform the essential functions of the job," Termination Letter, DXH, ECF No. 21-1. Given this, the Court rejects Plaintiff's argument that Electric Boat's opinion must be ignored as self-serving and concludes that Electric Boat's position is in good faith.

For Plaintiff's part, he has merely averred that "'[c]ritical [i]nspections' are not all the time by all inspectors and probably make up 10% of all inspections." Gailey Aff. ¶ 7(a), ECF No. 25. The Court takes this with a grain of salt given that Plaintiff also asserts that he is unaware of Electric Boat's definition of "critical inspections."[13]    Id. ¶¶ 3, 6.  Further, while Electric

---

[13]In his affidavit, Plaintiff explains that he assumes critical inspections to mean "hull integrity inspections." Gailey Aff. ¶ 3, ECF No. 25. Electric Boat has clarified that hull inspections fall under the umbrella of critical inspections. Def.'s Mem. 10. Assuming this to be the case and assuming that hull integrity inspections make up ten percent of an inspector's work, the Court's analysis does not significantly change. Given Electric Boat's conclusion and the fact that the inspector job description refers to hull inspections, see id., even if critical inspections are confined to hull integrity inspections, the Court is confident that Electric Boat has presented sufficient support to establish that critical inspections are an essential function of the inspector position given the nature of the work inspecting the hull of nuclear submarines.    See 29 C.F.R. § 1630.2(n)(3); Serrano v. Cnty. of Arlington, 986 F. Supp. 992, 1000 n.28 (E.D.

Boat has supported its conclusion, Plaintiff relies entirely on his opinion that critical inspections only comprise a fraction of an inspector's time and therefore cannot be an essential function. That said, even ignoring the self-serving nature of this opinion, the time spent on a task is but one factor in the analysis; a proportionally short amount of time does not inherently equate to a nonessential function. Indeed, in some cases the most essential function of a job makes up the smallest amount of the employee's time. See Serrano v. Cnty. of Arlington, 986 F. Supp. 992, 1000 n.28 (E.D. Va. 1997)("[T]he lifting and carrying of victims is an essential function of the position of firefighter because it is a task that must be performed whenever required, however infrequent that may be. Indeed, it is undisputed that actual firefighting and emergency medical services only constitute between 5% and 10% of a firefighter's work hours, yet it is also beyond doubt that these are the essential functions of the position." (internal citation omitted)); see also Martinson v. Kinney Shoe Corp., 104

---

Va. 1997).

However, the Court also notes that the evidence suggests that critical inspections encompass more than just hull inspections. See, e.g., Def.'s Mem. at 10; Gailey Employee File 55 (essential functions of inspector job as "look[ing] for, identify[ing], and monitor[ing] construction joints"). Ultimately, what exactly falls under the critical inspections umbrella is not determinative given the Court's above analysis.

F.3d 683, 687 (4th Cir. 1997) (holding that because plaintiff-salesperson's seizures impacted his ability to maintain store security, but one small aspect of role, he was not qualified under ADA). This is one such case where, even assuming critical inspections are a small fraction of Plaintiff's role, they are of such importance that the ability to conduct them is an essential function. See PRSUF ¶ 21 ("[H]ull integrity inspections are considered 'critical inspections.' If any part of the hull envelope of a submarine were to fail, it could inflict dire consequences."), ¶ 20 (critical inspections are those where the area of inspection is critical and failure "could have dire consequences on individuals or things"). Ultimately, Plaintiff cannot show that the ability to conduct critical inspections is not an essential function of the position.

B. Plaintiff Cannot Conduct Critical Inspections With or Without an Accommodation

Given the conclusion that the ability to perform critical inspections is an essential function of the inspector position, the next inquiry is whether Plaintiff can carry his burden to establish that he can perform the essential functions of the job with or without an accommodation. See Gillen, 283 F.3d at 24. The Court agrees with Electric Boat that Plaintiff cannot show

that he can conduct critical inspections.

In arguing that Plaintiff could not perform the essential functions of the job, Electric Boat emphasizes Plaintiff's memory lapses and the effect such lapses can have on his ability to inspect—such as his ability to remember what he had inspected and the inspection steps he had performed—stressing the potential for dangerous results. Def.'s Mem. 10-11. Electric Boat also relies on Dr. Kozel's report to Electric Boat that Plaintiff's condition posed a risk of harm to himself and others and his recommendation that Plaintiff not return to work and Dr. Stone's report that Plaintiff could perform these inspections "as long as he isn't seizing." See id. at 10. In response, Plaintiff, rather than presenting any contrary evidence, relies on flimsy arguments in an attempt to contradict Electric Boat's position. Plaintiff's case presents a failure of proof; Plaintiff cannot now, nor could he at trial, establish that he can perform the essential functions of the inspector position.

First, Plaintiff's history at Electric Boat establishes a concerning pattern. While on the job, Plaintiff has fallen from a ladder, accidentally left work entirely without any memory of doing so, abruptly left a work training, and had various memory lapses. Together these indicate a serious risk that Plaintiff

cannot carry out the responsibilities of the inspector position.[14] True, Electric Boat has not pointed to any specific inspection issues as a result of these incidents, but it was not required to wait until something went terribly awry to restrict Plaintiff's work—this is especially true given the serious nature of the work. See EEOC v. Amego, Inc., 110 F.3d 135, 145 (1st Cir. 1997) ("It was eminently reasonable for [employer] to be concerned about whether [employee] could meet her responsibilities, and also reasonable for it to conclude that the risk was too great to run."). Electric Boat's "judgment here about the risks of future behavior by an employee is based on past behavior and a reasonable indicia of future behavior."[15]  Id.

    Second, this is one of those positions where the essential

---

[14]Plaintiff points to the neuropsychological testing Dr. Lee performed as establishing that he has no memory issues.  See Outpatient Neuropsychological Consolation Report, PX6, ECF No. 26-6 (noting "average" memory).  However, the testing reflected Plaintiff's memory in general and Electric Boat's concern is Plaintiff's seizure disorder and his inability to recall actions taken during a seizure.  Thus, Dr. Lee's testing is of minor significance.  Further, Plaintiff has otherwise admitted that he does have trouble with his memory associated with seizure incidents.

[15]Plaintiff argues that because nothing bad has happened while he's been on the job yet, there is little chance of something bad happening in the future.  See Pl.'s Mem. Supp. Summ. J. Opp'n ("Pl.'s Mem.") 12, ECF No. 27.  This argument is pure conjecture, ignores the reality of probability mathematics, and relies on a false premise (the record establishes that the January 22nd

job functions implicate the safety of others, and, accordingly, "plaintiff must demonstrate that she can perform those functions in a manner that will not endanger others." Gillen, 283 F.3d at 24 (quoting Amego, 110 F.3d at 144); see also PRSUF ¶ 21. Although the harm is removed from Plaintiff's immediate actions, it is not disconnected. If an inspector misses a weld failure, that failure will not be realized until the submarine is complete and launched; it is not difficult to infer the possible resulting catastrophe. Plaintiff's only argument for why his condition will not harm others is that it wouldn't matter if he failed to note a weld issue as there are multiple levels of inspection and someone after him would discover any missed problems. See Pl.'s Suppl. Resp. 3, ECF No. 48. The Court rejects this; a chain is only as strong as its weakest link. See also Lang v. Wal-Mart Stores East, L.P., 813 F.3d 447, 456 (1st Cir. 2016) ("[A]n employer is not required to accommodate an employee by exempting [employee] from having to discharge an essential job function.").

Third, the medical evidence in this case supports a conclusion that Plaintiff cannot perform critical inspections. Plaintiff's

---

Incident stemmed from a seizure, which occurred while Plaintiff was at work). And, even if the probability of harm is low, the possible ramifications are tremendous. See, e.g., Gailey Dep. 80:24-81:9, DXI, ECF No. 22-2 (describing hull integrity inspection failure as possibly causing "dire consequences").

first treating neurologist, Dr. Kozel, recommended that Plaintiff not return to work on account of his condition.  Although Plaintiff's second neurologist advised that Plaintiff could return to work, he provided that was so only "as long as he isn't seizing" and that he would not pose any significant risk of harm to himself or others "as long as his seizures are controlled."  Dr. Stone did not explain how Plaintiff or Electric Boat could know if Plaintiff was seizing.  Further, the only advice he provided for controlling Plaintiff's seizures was that Plaintiff be well-rested and take his medication—both in Plaintiff's exclusive control.  Electric Boat had no meaningful way to ensure Plaintiff did not seize while at work, and Dr. Stone's recommendation that Plaintiff could return to work is of little value.  Thus, both medical opinions support the conclusion that Plaintiff could not perform critical inspections.

Next, the Court asks whether some reasonable accommodation would have enabled Plaintiff to perform the essential functions of the job.  See Gillen, 283 F.3d at 25 (citing Ward, 209 F.3d at 33).  Typically, at this juncture, the ADA plaintiff proposes an accommodation that he contends would enable him to perform the essential functions of the job.  See, e.g., Mulloy v. Acushnet Co., 460 F.3d 141, 153-54 (1st Cir. 2006) (analyzing plaintiff's proposed accommodation after determining that he could not perform

essential functions without accommodation).  Plaintiff, however, has not done so[16] and instead argues that no accommodation is needed.[17]  See Pl.'s Mem. 16-17.  Rather than blindly searching for a possible accommodation, the Court emphasizes the evidence revealing the seven-month process of review Electric Boat conducted and the resulting determination that no accommodation existed.  Andrews Decl. ¶ 17 (ARC board met to determine possible accommodations or alternative work); id. ¶¶ 21-22 (Dr. Andrews discussed possible accommodations with Dr. Kozel); id. ¶¶ 26-29 (Andrews following up with Dr. Stone to better understand how Electric Boat could accommodate Plaintiff's condition); ARC

---

[16]In passing, Plaintiff suggests that Electric Boat should have transferred him to the pipe shop. See Pl.'s Suppl. Resp. 6, ECF No. 48.  However, Plaintiff testified in deposition that he never made such a request while still at Electric Boat, Gailey Dep. 122:15-17, PX11, ECF No. 26-10, and he has presented no evidence regarding the feasibility of such a transfer (e.g., evidence as to whether there were even open positions at the time in question).  See Audette v, Town of Plymouth, MA, 858 F.3d 13, 21 (1st Cir. 2017)("Moreover, the employee must demonstrate that there is an actual vacant position to which she can transfer." (citing Lang v. Wal-Mart Stores East, 813 F.3d 447, 456 (1st Cir. 2016)).

[17]Plaintiff's argument reveals a flawed understanding of the term "accommodation."  Plaintiff seems to view the restrictions Dr. Andrews placed on his work (i.e., no critical inspections and no production areas) as accommodations.  See Pl.'s Mem. 16-17. Rather, the restrictions, as the name implies, are what require an accommodation because Plaintiff cannot perform the designated activities.

Interview 1-2, DXC, ECF No. 22-1 (detailing conversation regarding possible accommodations and noting determination that restrictions could not be accommodated); ARC Interview Two 1-2 (detailing conversation regarding possible accommodations and noting determination that restrictions could not be accommodated). As Plaintiff has presented no evidence to suggest the contrary, the Court credits Electric Boat's determination that no accommodation could enable Plaintiff to perform the essential functions of the job.[18]

Ultimately, the record only supports the conclusion that Plaintiff cannot perform the essential functions of the position, with or without an accommodation.

---

[18]Although Plaintiff now takes umbrage with the medical review process and its lack of clarity, he staunchly refused to participate in that process, hindering its effectiveness. See Andrews Decl. ¶ 23 (Plaintiff objected to Andrews speaking with his doctor); id. ¶ 32 (Plaintiff refusing to discuss Dr. Andrew's medical review); id. ¶ 35 (Plaintiff insisting he could return to work without accommodations despite restrictions). In any event, this argument goes to the third prong of the test, see Pena v. Honeywell Int'l, Inc., 923 F.3d 18, 31 (1st Cir. 2019), which the Court need not reach given its conclusion on the second.

IV. CONCLUSION

For the above reasons, Defendant Electric Boat's Motion for Summary Judgment, ECF No. 21, is GRANTED.


IT IS SO ORDERED.

_____
William E. Smith
District Judge
Date: